Marie Stuart SMITH and Charles R. Smith, Jr., Plaintiffs in Error,

v.

William H. SMITH et al., Defendants in Error.

No. 38063.

Supreme Court of Oklahoma.

March 3, 1959.

Savage, Gibson, Benefield & Shelton, Oklahoma City, Otey, Johnson & Evans, Ardmore, for plaintiffs in error.

Earl Q. Gray, Ardmore, for defendant in error, Will H. Smith.

Fischl & Culp, Ardmore, for defendant in error, Devereux Smith Brunner.

JACKSON, Justice.

This appeal involves a controversy between the beneficiaries under the will of C. R. Smith, deceased. The primary ques-

tions are as follows: (1) Are certain beneficiaries entitled to compel distribution of the residue of the estate? (2) If the estate must be distributed at this time, to whom and in what proportion should it be distributed under a proper interpretation of the will?

In April 1924, the testator executed a holographic will. He died in November, 1924, and his will was immediately admitted to probate in Carter County. The body of the will in its entirety is set forth as follows:

"This is my last will and I hereby revoke all other wills heretofore made by me. I give and bequeath to my wife, Mary Stuart Smith during her natural life or as long as she may remain single and to my son Charles R. Smith, Jr., and to my daughter Marie Stuart Smith, subject to charges hereby and hereinafter made against my estate; all of my property of every kind and description, however situated, lying and being within or without the state of Oklahoma, including personal property, real estate, bonds, stocks, choses in action, money, live stock, gas and oil rentals and mineral rights and reservations in lands wherever situated, within or without the State of Oklahoma.

"I give and bequeath to my son, William H. Smith, and to my daughter Margaret Smith Weeks, during their natural life time for their personal use and benefit ⅙th each of the net income from any estate of which I die seized; Payments to be made to them quarterly or as most convenient for my executrix and executors. In event of the death of either or both such sixth interest to revert to the surviving member, or members of my family and in case no member of my family surviving, then in that event such sixth interest shall revert to my nearest blood relations.

"I further direct that my said son William H. Smith be paid a monthly

salary such as fair and just from the net earnings of my estate, payment to continue as long as his services are profitable to my estate and acceptable to the majority of my family.

"I request that my estate be managed as a whole so long and as far as practicable.

"I constitute and appoint my said wife, executrix and my said sons executors of this will and direct that no bond be required further than the necessary probating of this will, and that no commission be charged by said executrix and executors, bequest being in lieu thereof."

The named parties qualified as executors and executrix. The widow died in 1925, and subsequently in the same year Charles granted William full authority to act as the sole executor of the estate. William served as sole executor and manager of the estate until 1954, at which time he turned over the management to Charles. $865,000 has been distributed as income from the estate, the book value of the remaining assets as of December 31, 1954, was $968,000.

In May 1955, William filed a petition for final settlement and distribution.

In June 1955, Marie and Charles filed their answer and request for distribution. The County Court made an order approving William's final accounts, but refused to order distribution. Marie and Charles appealed to the District Court. Subsequently, and six days prior to trial in the District Court William withdrew his request for distribution. The District Court vacated the County Court's determination of ownership, and refused to make such determination. However, the District Court approved and settled the final accounts, but refused to order distribution and directed that administration continue. Marie and Charles appeal.

We have concluded that the estate should be distributed, but before discussing our reasons for such conclusion, we deem it advisable to first interpret the will for the purposes of determining to whom and in what proportion the estate should be distributed.

The controversy in this connection stems from what we will term the "reverter" clause which we quote again as follows:

"In event of the death of either or both such sixth interest to revert to the surviving member, or members of my family and in case no member of my family surviving, then in that event such sixth interest shall revert to my nearest blood relations."

Marie and Charles contend that by the terms of the will the entire estate vested immediately in themselves and the widow, subject only to a charge in favor of Margaret and William of ⅛th of the net income each for their respective lives.

William contends that the above clause created a remainder in the fee and that Marie's and Charles' right to participate in such remainder is conditioned upon "survival".

As a predicate for their contention, Marie and Charles argue that the reverter clause was only intended to be effective in the event that William and Margaret predeceased the testator, and since they did not, such clause never became effective.

It is evident from a reading of the reverter clause that the testator was contemplating the possibility that *all* members of his family might be dead at the *time in question,* whether at the time of his death or at the time of the death of the income beneficiaries. At the time the will was executed the testator was 74 years of age. His widow was 58, William was 32, Marie was 30, Margaret was 27, and Charles was 18. We think it extremely unlikely that the testator contemplated the possibility that all five members of his family might precede him in death. Furthermore, there is no reason to assume that he would guard against such contingency with reference to ⅔ths of the income for life, yet fail to do so as to the balance of the estate devised to the widow, Marie and Charles.

We think it is clear that testator was referring to the death of Margaret and William at a time subsequent to the acquisition of their income gifts.

■ Marie and Charles further contend that the gift of the entire estate to themselves and the widow in the first paragraph of the will is absolute and unambiguous, and, therefore, cannot be impaired or cut down except by words equally clear and distinct as the words constituting the devise to them, citing In re Will of Friss, 45 Okl. 399, 149 P. 1176. This is a well established rule but has no controlling significance in this case. The devise contained in the first paragraph is expressly "subject to charges hereby and hereinafter made against my estate." What are the charges thereinafter made? This was a holographic will, written by a layman. If a subsequent provision of the will evinces an intent to limit the first devise by creating a separate remainder interest, there is no valid reason for concluding that such remainder interest is not one of the charges mentioned even though the word "charge" is ordinarily used in a more limited sense. See 57 Am.Jur. Wills § 1150.

84 O.S.1951 § 159, provides as follows:

"The words of a will are to receive an interpretation which will give to every expression some effect rather than one which shall render any of the expressions inoperative."

Had testator intended that in all events Marie and Charles (after the widow's death) should have the entire fee subject only to the income rights for the life of Margaret and William, it would have been very simple to have so provided. In fact there would have been no necessity for any further provision after such income gifts. But the testator attempted to make a specific gift over of something and not necessarily to Marie and Charles, because he provided that if no members of his family survived, such sixth interest should "revert to my nearest blood relations."

■ In the instant case we are primarily concerned with the gift to William for the reason that Margaret died in 1945, and the interested parties entered into a stipulation as to the meaning of the reverter clause insofar as it related to the gift to Margaret. However, it is unquestionable, in our opinion, that the testator intended that upon the death of Margaret, with William surviving, or vice-versa, the survivor should share in part of the gift to the other as a surviving member of the testator's family. Whereas, it is Marie's and Charles' contention in the instant case that the reverter clause never became effective and should be completely ignored.

As hereinabove stated, we are of the opinion the testator intended that upon the death of Margaret or William something would go to all the surviving members of the family, or to his nearest blood relations. The primary difficulty encountered is in attempting to determine the nature of the interest which he intended to revert.

■■ The second paragraph contains an income gift to Margaret and William for life. Then follows the reverter clause wherein reference is made to "such sixth interest". Does this mean such income interest? It is admittedly subject to such interpretation, but if we give it this interpretation we reach an anomalous result. There would be no limitations or restrictions upon the length of time which such income right could be separated from the right to possession and could conceivably be so separated forever, if Charles and Marie do not survive William. We do not think the testator intended such a result. Furthermore, if property is devised to one person with the right to possession, but charged with the duty of paying a fractional part of the income to another, it is our opinion that an express trust is created, though the word "trust" is not used. See Annotation 147 A.L.R. 605, and Quigley v. Gridley, 132 Mass. 35, wherein it is said:

"The income is to be paid to them semiannually, and therefore the principal is to be held in trust by someone."

60 O.S.1951 § 172, provides in part as follows:

"Such express trusts shall be limited in the duration thereof either to a definite period of not to exceed twenty-one (21) years, or to the period of the life or lives of the beneficiary or beneficiaries thereof in being at the time of the creation of the trust."

Since a perpetual trust cannot be created we should, if possible, assume that the testator did not attempt to do so. In 57 Am. Jur., Wills, § 1126, the following statement appears:

"The object in the construction of wills is not to seek flaws in the instrument and declare it invalid, but rather to sustain it if legally possible. The presumption is that the testator intended a lawful rather than an unlawful thing, and the courts do not search for a construction which will nullify his will or any parts thereof. That construction is to be adopted which will sustain and uphold the will in all its parts, if it can be done consistently with the established rules of law. If the language used is reasonably susceptible of two different constructions, one of which will defeat, and the other sustain, the provisions, the doubt is to be resolved in favor of the construction which will give effect to the will, rather than the one which will defeat it. A proposed construction of an ambiguous provision which assumes an intention to make a lawful gift will be accepted when such construction does no violence to the testator's purpose. Thus, if under one construction a bequest would become an illegal perpetuity while under another construction it would be valid and operative, the latter mode must be preferred. But when the language of the provisions of a will is plain and unambiguous, courts are not permitted to wrest it from its natural import in order to save it from condemnation."

The meaning of the reverter clause is certainly ambiguous. We cannot say with certainty what was intended. The testator might actually have intended to separate the income from possession forever. On the other hand, he might have been of the opinion that he had set aside a ⅔th interest in the fee to produce the income for Margaret and William. If so, the reference to such sixth interest could mean a fee interest. Because of this ambiguity we must resort to accepted rules of construction.

Another aid in the construction of an ambiguous provision of a will is evidence of a practical construction placed on such provision by the interested parties. In 67 A.L.R. 1273, the author of an Annotation on this subject states:

"Where parties interested have acted upon a not unreasonable construction of an ambiguous will, such fact may be considered by the court in deciding as to the true construction."

See also 94 A.L.R. 245, and 57 Am.Jur., Wills, § 1131.

In 1945, shortly after Margaret's death, Marie, Charles and William entered into a stipulation approved by the County Court wherein it was stipulated that any question as to the interpretation of the will arising by reason of Margaret's death should be resolved in the following manner:

"1. The one-sixth (⅙) interest upon which Margaret Smith Weeks did prior to her death receive the income shall be treated as passing in equal shares to the three (3) parties to this agreement, a one-eighteenth (⅟₁₈) to each.

"2. This interest, the one-sixth (⅙) a one-eighteenth (⅟₁₈) to each, shall be regarded as owned in that share in fee simple by each of the parties to this agreement, with the net income from that share from and after the date of the death of Margaret Smith Weeks accruing to each of these parties in that proportion."

This stipulation gives full effect to the reverter clause, and acknowledges that the words "such sixth interest" contained therein refers to a ⅙th interest in the fee. If the

⅛th interest upon which Margaret had received the net income for life had been treated according to Marie's and Charles' present contention, William would have received no part of it, nor any part of the income therefrom. It is significant to note that this stipulation was entered into approximately twenty years after the will was admitted to probate during which time the parties had ample opportunity to reflect on the meaning of such reverter clause.

For the foregoing reasons, we hold that the reverter clause created a remainder in ⅔ths of the fee in favor of the designated classes subject to vest or become absolute upon the deaths of Margaret and William. The ⅛th remainder after the life of Margaret has already become absolute in Marie, Charles and William, not only by reason of the stipulation but also by the terms of the will.

In the above connection we must point out that at the time of Margaret's death William had a child. That child, Devereux Smith Brunner, intervened in this action contending that she was a surviving member of the testator's family at the time of Margaret's death, and that if she survives William she will be a surviving member of the family. In this appeal she waives any claimed interest in the remainder after the death of Margaret, but still contends that after the death of her father she will participate in ⅛th of the fee as a member of the testator's family.

■ Intervenor was not and will never be a "surviving member" of the testator's family though she might take as his "nearest blood relations." Intervenor relies on 84 O.S.1951 § 168, which provides as follows:

"A testamentary disposition to 'heirs,' 'relations,' 'nearest relations,' 'representatives,' 'legal representatives,' or 'personal representatives,' or *'family,'* 'issue,' 'descendants,' 'nearest,' or 'next of kin,' of any person, *without other words of qualification,* and when the terms are used as words of donation, and not of limitation, vests the prop-

erty in those who would be entitled to succeed to the property of such person according to the provisions of the article on succession in this chapter." (emphasis ours)

The provision of the will under consideration does contain other words of qualification. The testator provided that the remainder should go to the surviving members of his family, and if none survived, *then* to his nearest blood relations which shows an affirmative intent to exclude from the family class his other heirs who would normally take by the laws of succession, because those falling in that category take *only* if there are no survivors in the first mentioned class. In other words, testator could not have intended those who would take by the laws of succession (nearest blood relations) to be in both classes because that would make the alternative provision wholly redundant.

We turn now to the question of whether Marie and Charles are entitled to compel distribution at this time. In May, 1955, William filed a petition for distribution. After the trial in the County Court, and appeal to the District Court, he withdrew his request for distribution and now contends that distribution should not be made. Both the County Court and District Court refused to order distribution.

William attempted to justify his change of position by introducing evidence of discord between him and the other beneficiaries occurring subsequent to the filing of his petition for distribution. He contends that the administration of the estate must be continued in order that he may be protected from Marie and Charles. He further contends that the provisions of the will compel a continuation of administration in that testator requested that the estate "be managed as a whole so long and as far as practicable," and because the payments of income are to be made by the executor.

■ As will be more fully explained hereinafter, we are of the opinion that a trust for the lives of Margaret and William was created in the instant case. In In re

Vance's Trusteeship, 102 Okl. 129, 227 P. 881, 882, we said:

"so long as the estate of Benjamin Vance, the testator, was in process of settlement by the executor of his will, exclusive jurisdiction of such estate, not settled or distributed, was in the county court. When such estate was fully administered by the executor and was ready for distribution, it went to William Vance, trustee, and was no longer the estate of a deceased person."

And in the first paragraph of the syllabus we held as follows:

"The title to the property in an express trust is in the trustee, and such trustee in the administration of such trust is subject to the control and supervision of a court of equity, and not of the probate court."

The debts have been paid, the estate has been settled, and what William claimed to be the final accounts have been settled and approved.

█ 58 O.S.1951 § 611, provides that if all the debts have been paid the court *must* direct distribution, unless the estate be not in a proper condition to be closed, in which case a reasonable extension must be granted for a final settlement of the estate. 58 O.S.1951 § 612, provides that when the debts are paid and the estate is in a proper condition to be closed, the executor or administrator must render a final account. 58 O.S.1951 § 631, provides:

"Upon the *final settlement of the accounts* of the executor or administrator, or at any subsequent time, upon the application of the executor or administrator, or of any heir, legatee or devisee, the court *must* proceed to distribute the residue of the estate in the hands of the executor or administrator, if any, among the persons who by law are entitled thereto; * * *." (Emphasis ours.)

Technically speaking the final accounts have been settled, but, on the other hand, the court ordered administration to continue which necessarily means there must be a further accounting. Therefore we do not hold that distribution must be made for this reason alone. However, we are of the opinion that the above mentioned statutes disclose a purpose to require decedent's estates to be distributed as soon as reasonably possible.

In Ozark Oil Co. v. Berryhill, 43 Okl. 523, 143 P. 173, it is held in the first paragraph of the syllabus:

"The county courts of this state are of limited jurisdiction, and have only such jurisdiction as is specifically granted by section twelve, art. 7, of the Constitution, and as is conferred by acts of the Legislature, which are in harmony with the provisions of the Constitution."

Art. 7, § 12, Oklahoma Constitution, prescribes the jurisdiction of the county courts which includes original jurisdiction in probate matters and limited jurisdiction in other matters.

█ A probate of a decedent's estate does not include the supervision and management of the estate except insofar as is incidental to the primary objectives of the probate; that is, to prove the will, if any, pay the debts, and distribute the property.

█ Of course in the instant case the will merely contains a *request* that administration continue so long as practicable, and the provision that the executor make the income payments is of no greater significance, because the executor cannot make the income payments if administration is discontinued as being impracticable. But even if it is possible to construe these two provisions as mandates by the testator, we hold that they would be violative of the public policy of this state insofar as they can be construed to require a continuance of administration in this case for more than 30 years, unless there are some valid and compelling reasons for further continuation of administration. A mere desire on the part of William to manage the estate is insufficient.

█ Distribution at this time should not create a hardship on William. In addition

to the income from 1/18th of the fee, which William owns outright, he is entitled to an additional 1/6th of the net income for life in connection with which he will have no possessory rights. As to this undivided fractional interest, we think it follows that by the terms of the will the owners of the balance of the fee, and those entitled to possession; that is, William, Marie and Charles, are trustees of such 1/6th interest for the life of William. See Johndrow v. Johndrow, 199 Okl. 363, 186 P.2d 325.

Since the testator contemplated distribution when and if it became impracticable to manage the estate as a whole, the executors were not trustees, they were merely invested with a power of indefinite duration. Whitmore v. Smith, 94 Okl. 90, 221 P. 775. Upon William's death both the legal and equitable interest will go to the remaindermen. The trustees will be subject to the supervision and control of the District Court and William, the beneficiary for life, will have the same rights and be given the same protection as the cestui que of any other trust.

The County Court held that since the identity of those individuals who will take the 1/6th interest upon William's death cannot now be determined, distribution should not be made. William contends this conclusion was proper because after the executor loses control of the estate it will be impossible to make an acceptable title for purposes of leasing. We do not agree.

The 1/6th remainder will be distributed to the members of the testator's immediate family surviving William, and if none survive, then to the testator's nearest blood relations. It is not necessary to determine whether we have a vested remainder in a class (the surviving members of testator's family) subject to a condition subsequent, or whether it is a true contingent remainder as to both classes. In either case a present interest passes. In Simes on Future Interests In Land, Sec. 65, page 55, the author states:

"Today a contingent interest has come to be regarded as having present existence quite as certainly as a vested interest."

Franklin v. Margay Oil Corporation, 194 Okl. 519, 153 P.2d 486, 499, involved a so-called contingent remainder to the issue of a named beneficiary. In that case the court said:

"But the class designated in the will as the 'issue of Vivian Ada Franklin' is subject to open and let in after-born members. That class, including possible after-born issue of Vivian Ada Franklin, immediately upon the effective date of the trust, became the owner of a vested remainder in fee simple in the trust property, subject to conditional limitations, i. e., defeasible in whole or in part upon a condition subsequent. * * *."

In the case at bar both classes specified in the reverter clause became the owner of a present interest upon the death of the testator. Whether such interest is vested subject to being defeated, or is a true contingent remainder as to either or both classes is immaterial. In any event, this interest can be leased. The Franklin case involved a quiet title action by a lessee who had obtained a lease of the property from the trustees of a testamentary trust, and the life beneficiaries. A trustee was appointed for the unknown or unborn contingent remaindermen. We held this to be a proper procedure, and that the judgment quieting title was binding on such unknown or unborn contingent remaindermen. In that case we said a judgment quieting title was proper because the unknown or unborn contingent remaindermen's interest was no greater than the rights of living parties to the action properly represented who had no permanent interest in the leased property, because what interest they had was subject to an express power of the trustee to completely dispose of the property.

By the terms of 60 O.S.1951 § 175.24, a trustee has the right to sell or lease real property of the trust estate. This act became effective after the death of the testator and could not impair the rights of

remaindermen. The Franklin case held that the general powers of a trustee would not include the right to 'lease for oil and gas purposes where oil and gas was discovered after creation of the trust. Here the properties were producing prior to the creation of the trust, and the testator specifically contemplated the management of the estate by the executor and upon distribution by the trustees. The power to manage oil and gas properties surely includes the power to lease. Therefore it should not be necessary to quiet title in order to establish the validity of a lease, but if for any reason it becomes necessary, and an action against the trustee alone is insufficient (See Simes § 1811) the remaindermen can be bound by the procedure followed in the Franklin case joining as a party defendant a living and present member of either class, if any, and if not, the life beneficiary. See Simes § 1814. See also the discussion in Gavin v. Curtin, 171 Ill. 640, 49 N.E. 523, 40 L.R.A. 776, and Simes § 1814 as authority for judicial sales of the fee, and prescribing the manner for protecting the interests of unknown or unborn remaindermen, in those cases where the remaindermen's interest is not subject to management or disposition during the life of the life tenants.

The fact that the order of distribution will leave at large the particular names of the individuals entitled to share in this remainder interest is of no import. 84 O.S. 1951 § 257, provides a specific method for judicially determining the names of such individuals at the proper time. We find no valid reason as to why the estate is not in a condition to be closed.

Finally William contends that there was a remainder of ⅓rd after the death of the widow as to which the deceased died intestate, and further that the widow received ⅓rd of the property, which was far less than she was entitled under the law so that one-third of the estate passed to her heirs since she did not elect to take under the will. We find no merit in these contentions.

The judgment of the District Court is reversed, with directions to enter judgment distributing the property of the estate in the proportion and to the persons entitled as set forth in this opinion.

DAVISON, C. J., and WELCH, JOHNSON, BLACKBIRD, IRWIN and BERRY, JJ., concur.

WILLIAMS, V. C. J., dissents.